# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-1046

## STATE OF LOUISIANA IN THE INTEREST OF F.A. AND A.A.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT,
JUVENILE COURT DOCKET
PARISH OF LAFAYETTE, NO. 2002-0091
HONORABLE HERMAN C. CLAUSE, DISTRICT JUDGE

**********

## JOHN B. SCOFIELD
## JUDGE

**********

Court composed of Billie Colombaro Woodard, Elizabeth A. Pickett, and John B. Scofield,[*] Judges.

**AFFIRMED.**

**John A. Hernandez III**
**Attorney at Law**
**321 W. Main, Suite 2-G**
**Lafayette, LA 70501**
**Counsel for Appellant:**
     **J. A.**

**L. Antoinette Beard**
**825 Kaliste Saloom Road**
**Brandywine I, Room 218**
**Lafayette, LA 70508**
**Counsel for Appellee:**
     **State of Louisiana, Dep't of Social Servs.**

---

[*]Honorable John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

SCOFIELD, Judge.[1]

J.G.A. (JGA), the mother of the minors, A.V.A. (AVA), and F.M.A. (FMA), appeals a judgment of the trial court terminating her parental rights and certifying the minors eligible for adoption. Both AVA and FMA have different biological fathers. Neither the biological father of AVA nor the biological father of FMA, whose rights were also terminated, appeals the judgment. We affirm the judgment of the trial court.

**FACTS AND PROCEDURAL HISTORY**

The minors, AVA and FMA, first came to the attention of the Department of Social Services on January 11, 2002, through the filing of a report by a third party of the alleged medical neglect by JGA of FMA and the alleged neglect through dependency by JGA of both children. FMA had been born with breathing problems which necessitated her being placed on an apnea monitor. JGA impeded a respiratory therapist's attempts to visit FMA in order to obtain readings from the monitor and, finally, admitted to the therapist that she had removed the monitor because she could not stand the monitor's beeping. FMA was transported by Social Services to University Medical Center and was kept overnight so that tests could be performed to determine if FMA's breathing problems were persisting.

Investigation by Social Services at that time revealed that JGA had been unemployed for some time and that she and the children had not had stable living conditions since the utilities in their trailer had been cut off the month before. The three of them were, at that time, living with JGA's mother in a small apartment. The

---

[1] Honorable John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.

1

apartment was cramped as JGA's sister and her two small children were also living there. Because FMA had no bed, she was sleeping on pillows in a closet.

When the tests at the medical center revealed no abnormalities in FMA's breathing, she was returned to her mother's care. Social Services provided JGA with a bed and diapers for FMA and arranged protective daycare for both children so that JGA could have time to seek employment.

In the weeks following the previously described incidents, JGA did not find employment and had to discontinue sending the children to daycare because she was unable to pay for the necessities required by the daycare center. Additionally, during this period of time, JGA and her sister were involved in a number of physical altercations, at least two of which required police intervention. Following a fight on February 7, 2002, JGA was arrested and incarcerated in the Lafayette Parish Correctional Center. During the altercation which led to her arrest, JGA sustained a fractured bone in her right hand.

During this period of time, it was also discovered that JGA had been previously diagnosed as suffering from bipolar disorder and placed on medication, but that she had not taken the prescribed medication for the last two years.

Based upon the foregoing facts, the trial court issued an Instanter Order on February 8, 2002, placing the children in the custody of Social Services. At a hearing on February 13, 2002, all parties agreed that the children should remain in the custody of Social Services pending further adjudication. A Court Appointed Special Advocate was named to represent the best interest of the children. A "Child In Need Of Care" hearing was held on March 19, 2002. As a result thereof, the children were adjudicated in need of care, and were continued in the custody of Social Services.

Also, a visitation schedule was established and a case plan was instituted for JGA.

A disposition hearing was held on August 20, 2002, wherein custody was continued in Social Services. At the January 21, 2003 disposition hearing, the goal of Social Services, in respect to the children, was changed to adoption.

Thereafter, Social Services filed a petition for termination of parental rights. The parents answered the petition, and after several delays, a hearing on Social Services' petition to terminate parental rights was held on April 27, 2004. At the conclusion of that hearing, the court took the case under advisement, announcing that the decision would be made the following day. The court terminated parental rights and declared the children free for adoption. JGA appeals.

**LAW AND DISCUSSION**

Both the United States Supreme Court and the Louisiana Supreme Court have recognized that the termination of parental rights is the most serious interference the State can take in regard to a family unit. In *State ex rel. J.M.*, 02-2089, p. 7 (La. 1/28/03), 837 So.2d 1247, 1251-52 (footnote omitted), our supreme court discussed in detail the law applicable to termination of parental rights stating the following:

> In *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599 (1982), the United States Supreme Court recognized that natural parents have a fundamental liberty interest in the care, custody, and management of their child and that the natural parents' interest does not "evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." The Court went on to acknowledge that, while the State has an "urgent interest" in a child's welfare and in providing the child with a permanent home, as long as there is reason to believe that a positive, nurturing parent-child relationship exists, the State's interest must favor preservation over severance of natural familial bonds. *Id.* at 766, 102 S.Ct. at 1401 (quoting *Lassiter v. Department of Soc. Servs.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Thus, the Court found that parents who are faced with the possibility of forced dissolution of their parental rights must be provided with fundamentally fair

procedures in order to ensure that children's legal bonds are not erroneously severed from fit parents. *Id.* at 753-54, 102 S.Ct. at 1395.

The supreme court in *J.M.* also recognized that the gravity of terminating parental rights requires our courts to impose a stricter standard of proof in these cases. Rather than utilizing the preponderance of the evidence standard, the State must prove by clear and convincing evidence that the natural parents cannot or will not provide a normal family home for the children.

Although the fundamental rights of the parents to keep and care for their children are to be scrupulously maintained, the rights of the children to a secure, stable, long term relationship are crucial to the equation. "In balancing these interests, the courts of this state have constantly found the interest of the child to be paramount over the parent." *Id.*, at 1252.

In order to terminate parental rights, La.Ch.C. art. 1015(5) requires the following:

> Unless sooner permitted by the court, at least one year has elapsed since a child was removed from the parent's custody pursuant to a court order; there has been no substantial parental compliance with a case plan for services which has been previously filed by the department and approved by the court as necessary for the safe return of the child; and despite earlier intervention, there is no reasonable expectation of significant improvement in the parent's condition or conduct in the near future, considering the child's age and his need for a safe, stable, and permanent home.

Even fulfilling the requisites of article 1015 will not allow the termination of parental rights if doing so is not in the best interests of the children.

As stated, in the case at hand, the State had established a court-approved case plan for JGA to follow. Louisiana Children's Code art. 1036(C) enumerates as

follows the substantive elements necessary for the State to prove lack of compliance with the case plan:

> (1) The parent's failure to attend court-approved scheduled visitations with the child.

> (2) The parent's failure to communicate with the child.

> (3) The parent's failure to keep the department apprised of the parent's whereabouts and significant changes affecting the parent's ability to comply with the case plan for services.

> (4) The parent's failure to contribute to the costs of the child's foster care, if ordered to do so by the court when approving the case plan.

> (5) The parent's repeated failure to comply with the required program of treatment and rehabilitation services provided in the case plan.

> (6) The parent's lack of substantial improvement in redressing the problems preventing reunification.

As indicated, La.Ch.C. art. 1036(C)(6) requires the parent to demonstrate "substantial improvement in redressing the problems preventing reunification." Louisiana Children's Code art. 1036(D) follows up by setting forth as follows the substantial elements to be considered in determining the lack of such improvement:

> (1) Any physical or mental illness, mental deficiency, substance abuse or chemical dependency that renders the parent unable or incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm, based upon expert opinion or based upon an established pattern of behavior.

> 2) A pattern of repeated incarceration of the parent that has rendered the parent unable to care for the immediate and continuing physical or emotional needs of the child for extended periods of time.

> (3) Any other condition or conduct that reasonably indicates that the parent is unable or unwilling to provide an adequate permanent home for the child, based upon expert opinion or based upon an established pattern of behavior.

5

In addition to these rigorous statutory requirements, our courts exercise extreme care and caution in addressing the grave prospect of terminating parental rights. The supreme court in *J.M.* expressed it well:

> This court has always recognized, however, that great care and caution must be exercised in these proceedings because the permanent termination of the legal relationship existing between children and their biological parents is one of the most severe and drastic actions the State can take against its citizens. *State in the Interest of G.J.L. and M.L.*, 791 So.2d at 85; *State in the Interest of J.A.*, 752 So.2d at 811. Parents have a natural, fundamental liberty interest in the continuing companionship, care, custody and management of their children, which warrants great deference and vigilant protection under the law. *Id.* Thus, we recognize that the potential loss to parents is grievous, "perhaps more so than the loss of personal freedom caused by incarceration." *Id.* Because due process requires that a fundamentally fair procedure be followed when the State seeks to terminate the parent-child legal relationship, actions to terminate must be scrutinized very carefully. *Id.*
>
> . . . .
>
> Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens. However, as noted previously, the primary concern of the courts and the State remains to determine and insure the best interest of the child, which includes termination of parental rights if justifiable statutory grounds exist and are proven by the State. *State in the Interest of S.M.W.*, 00-3277 (La.2/21/01), 781 So.2d 1223.

*Id.*, at 1252-54.

In the case sub judice, the record shows that Social Services proved the following by clear and convincing proof : (1) that JGA failed to contribute to the costs of the children's foster care, (2) that her lack of substantial improvement in redressing the problems prevents reunification, and (3) that there is a lack of a reasonable expectation of significant improvement in the near future as demonstrated by JGA's failure to secure adequate independent housing or stable employment. The record is also replete with evidence that it would be in the best interests of the children to terminate JGA's parental rights and free the children for adoption.

Social Services' first witness was Dr. Ed Bergeron, a licensed psychologist who evaluated JGA on two separate occasions. Dr. Bergeron also scheduled sixteen counseling sessions, but JGA only kept five. He stated that JGA admitted that she has a temper control problem and that her housing situation is unstable. JGA related that she had an abusive, alcoholic father and that she had been raped at the age of fifteen. Her medical history revealed that she had a psychiatric episode in 1998 which required hospitalization and that she had been diagnosed as having bipolar disorder and placed on Paxil and lithium. She quit taking her medications when she first became pregnant and never resumed taking them.

Testing revealed JGA has an IQ of eighty-seven and, according to Dr. Bergeron, the results of her MMPI test revealed "severe emotional problems, depression, inability to modulate her emotions in an adaptive fashion; in other words, she tends to overreact to things, little things provoke some rather dramatic responses. And also, there's a great deal of mood swings." Dr. Bergeron also administered a Formal Assessment of Personality test. In his opinion, the results of that test "showed essentially a lot of instability, very similar to the personality test; that she was generally unstable; that she was characteristically, you know, immature, moody, restless, and overreactive, irritable, [and] having a low frustration tolerance."

Finally, Dr. Bergeron administered the Child Abuse Potential Inventory test. He believed this test showed JGA in need of counseling, anger management and further indicated that she should resume some form of psychiatric medication. In sum, he concluded that in addition to her bipolar disorder, JGA suffered from both post-traumatic stress disorder and borderline personality disorder.

As stated earlier, Dr. Bergeron began counseling sessions with JGA, but she only came to the first five sessions, those that were scheduled between September 4, 2002 and October 10, 2002. She failed to attend the next eleven scheduled sessions.

Dr. Bergeron again saw JGA on December 12, 2002. At that time, she admitted that after she quit coming to counseling, she had another fight with her sister and that she "gave up on her life." JGA told Dr. Bergeron that she stopped working on her treatment plan, started smoking marijuana, and had self-medicated herself. She stated that she had come to realize she loved her children and wanted another chance. Dr. Bergeron agreed to help her and set up an appointment with a physician so that she could be prescribed medication for her psychiatric condition. JGA failed to keep the appointment with that doctor.

Dr. Bergeron re-evaluated JGA on December 8, 2003. During that visit JGA admitted that the odds on reunification with her children were slim because "she had not really established a pattern of stability. . . . had not maintained steady employment and . . . . had not secured her own residence." Additionally, she had never resumed her psychiatric medications. As a result of that examination, Dr. Bergeron concluded that JGA was not ready to be reunited with her children and that she was still in need of "some rather extensive psychotherapy."

Ms. Asia Jones was the Social Services case worker on this case for the first eighteen months. She explained that JGA's case plan called for her to obtain stable employment and independent living conditions, to complete parenting classes, to obtain psychological help, to visit regularly with her children, and to pay child support of fifty dollars per month. Ms. Jones explained that while JGA made sporadic attempts at working on her case plan, she simply failed to meet any one of

8

the goals. JGA was unable or unwilling to keep a job for any length of time; she never managed to find a residence of her own; she never paid child support; her visits with the children were sporadic and, at times, disruptive; and although she was evaluated by Dr. Ed Bergeron, she failed to follow up for the counseling he found she needed. Ms. Jones also testified that JGA refused some of the services offered to her, such as enrolment in the New Life Center. On two separate occasions JGA just disappeared for weeks at a time. The record shows that between the opening of the case by Social Services and the termination hearing, JGA had six residences, all provided by third parties, and five jobs. According to JGA, she was supposed to start her sixth job later in the week. In sum, Ms. Jones testified as follows:

> I mean, I think - - you know, the Agency and myself, I think we went above and beyond. I mean, we worked with J[. . . .]. We offered her different services. Family visits, we transported her. It was to the point where if her mom was sick I would take the children to the hospital to visit. We were more accommodating. J[. . . .] had - - J[. . . .] showed no stability. She showed no responsibility as a parent for the kids, by not showing up for family visits, for not trying to stay at job for longer than what she was. Every job she worked she would say that it was the job that caused her to leave or to be fired. She never took responsibility for her actions, and I feel like the Agency, we walked her hand-in-hand through her case plans. I always made sure that she had what she needed. If she needed a ride, we would either transport or set transportation up. We even got bus tokens for her to accommodate her to get to visits and everything. But, I mean, at this point, I mean, I think the Agency has exhausted every possible thing they can do to reunify her with her kids ro to help her in that manner.

On cross-examination Ms. Jones was questioned about her investigation of "any problems that might have existed" in the foster home. She recounted one incident where, following a visit, JGA reported bruising on AVA's hands. Ms. Jones investigated and found out AVA had self-inflicted the bruises and a large blister by repeatedly hitting herself with a scrubbing brush. This behavior was consistent with the findings of Ms. Christine Dugas, a clinical social worker, who started seeing AVA

in September of 2003. Ms. Jones suggested that, in the future, the foster mother use sponges for cleaning.

Bernadette Viltz, who succeeded Ms. Jones, took over the case in August of 2003. During most of that time JGA had been living with her boyfriend and the boyfriend's mother and sister. She is currently pregnant by that boyfriend with her third child. Approximately a week and a half before the trial, because of continuing conflicts with her boyfriend's mother and sister, JGA moved in with her aunt in Abbeville.

Ms. Viltz verified that JGA has failed to attend mental health counseling and that in both August 2003 and January 2004, JGA did not show up for scheduled visits with her children. She also verified that while some visits were "good," others were disruptive. Ms. Viltz stated that it is Social Services' position that termination would be in the best interest of the children. She testified that the children have been in the same "adoptive resource home" since they came into the agency's care on February 7, 2002, that the children are doing well in that home, and that the foster parents wished to adopt the children should they become free for adoption.

When Ms. Viltz was asked if she thought there was anything more that she could have done for JGA, Ms. Viltz replied, "Well, I think I [went] above and beyond for her, and if she had asked for assistance I would have been there for her."

The trial court also heard testimony from Ms. Christine Dugas, a clinical social worker, who was called in to work with AVA in September 24, 2003. Ms. Dugas stated that AVA had begun experiencing sleep disturbances and nightmares; that she had become physically aggressive toward FMA and her foster mother; that she had begun smearing feces, destroying toys and house-hold items; and that she exhibited

prolonged temper tantrums. The behavior was so disruptive that the child had to be medicated. Ms. Dugas commented that AVA would do well up until a visit with JGA, then would regress. In her opinion AVA is torn by having two mother images and needs resolution to the current situation. Ms. Dugas recounted the following:

> I think this would be of interest to the Court - - at her session last week, which was held on April 21st, she was playing with some miniatures, an angel, a mermaid and a fairy figure, and she asked that I hand her a snow globe that was up on top of the shelf which contains an angel and some little children. So I gave that to her, and she took the small angel figure and she began kind of beating the head of the angel against the snow globe. And at first I wasn't sure, you know, what this was all about, and then she explained to me that the angel could not live with her mother. And then she took the angel and she began to walk it away from the snow globe, and she said, "So she's going to find another mother."

> Out of the mouths of babes.

Considering the foregoing, and the record as a whole, we cannot say that the trial court was clearly wrong in terminating JGA's parental rights. The record demonstrates that Social Services carried its burden of proving by clear and convincing evidence that JGA cannot or will not provide a normal family home for AVA and FMA; that it is in the best interests of the children to terminate her parental rights; and that justifiable statutory grounds exist and were proven by the State.

Accordingly, for the reasons stated, the judgment of the district court is affirmed. Inasmuch as JGA is indigent, we pretermit the assessment of costs.

**AFFIRMED.**